33070. EVANS MOTORS OF GEORGIA INC., *v.*
HAMILTON.

DECIDED DECEMBER 5, 1950.

*Woodruff, Swift & Dorsey,* for plaintiff.

*James Venable, James L. Flemister,* for defendant.

WORRILL, J.  On April 9, 1948, the plaintiff, Evans Motors of
Georgia, purchased two Chevrolet automobiles paying therefor
the sum of $4250. The bills of sale to the plaintiff on the two
automobiles were signed by C. A. Callahan, as seller, and the
check paying for them was made payable to the order of Cal-
lahan and was endorsed, "Pay to the order of the Citizens &
Southern National Bank 200-1620 Mitchell Street Office 200-
1620 Atlanta, Georgia, Hamilton Used Cars—Charles Hamil-
ton." Subsequently the plaintiff resold the two automobiles to
third parties and thereafter it developed that the automobiles had
been stolen in South Georgia. Because of this fact, Evans had
to purchase the titles to the automobiles from the true owners,
and, having done this, the plaintiff made demand upon the de-
fendant, Charles Hamilton, for reimbursement for this loss. All
of these facts are admitted by way of stipulation.

Hamilton denied liability on the transaction, and Evans sued

him on the warranty of title to the two automobiles, and, upon the trial of the case, substantially the following additional facts appeared: Callahan had been employed by Evans as sales manager but had been desirous of making a change. He went to the defendant, Charles Hamilton, who operated a used car lot a short distance from Evans' lot and sought an arrangement with Hamilton. Pursuant to these talks Callahan moved to Hamilton's lot and engaged in the business of buying and selling used automobiles. Under the agreement, Callahan testified that his arrangement was to buy and sell automobiles on a 50-50 basis, and, except for the first $25 profit on each automobile sold by him, which he was to pay to Hamilton, they were to split the profit made on each automobile, each taking half of it. He also testified that, under his arrangement with Hamilton, he was to assist Mr. Rodgers, a salaried employee of Hamilton, who, under the evidence, had charge of Hamilton's interests at the used car lot in Hamilton's absence, by answering the telephone when he was out and by doing anything else that came up that Rodgers might need assistance in; that he bought and sold cars; that he didn't have a license to do business but operated under Hamilton's license; that he had no sign on the lot and his name did not appear anywhere in connection with the business; that he sold any car on the lot, whether or not it was one he had bought or one purchased by Hamilton or one of the other men working on the lot; that when he bought cars the money came from Hamilton; that when Hamilton was out of town he got the money by using signed checks that Hamilton had left in the care of Rodgers; that on such occasions he would simply fill in the amount and payee of the check over Hamilton's signature; that Hamilton issued the regulations for the operation of the lot; that he, Callahan, did not own the two cars sold on the occasion in question, Hamilton owned them; that he didn't individually own any of the cars that were sold; that there was no agreement between him and Hamilton as to how long the arrangement would continue but that Hamilton could have stopped the arrangement at any time by simply refraining from writing any more checks; that under his agreement with Hamilton he had the authority to buy and sell any cars that he pleased; that Hamilton did not tell him when to be at work,

it was up to him; that as to whether the only arrangement he had with Hamilton was that he was to provide up to $15,000 for him to buy and sell automobiles, he didn't remember any particular amount, though he had said that he had not drawn that amount; that he had authority to buy and sell automobiles in his own name; that when he was at Hamilton's lot no Social Security tax was taken out of his earnings or paid by Hamilton; that "The direct arrangement I had with Mr. Hamilton was that he would supply the money or do the financing for these automobiles, and as consideration for furnishing that location and facilities and as rent he received one-half of the profits of the deals that I had made in the month immediately prior to the time we settled up after his $25 deduction was made"; that he bought and sold the two automobiles involved in this suit; that Hamilton was not even in town at that time; that, except for an automobile which he bought for his personal use and later sold, he never bought any automobiles with his own money; that when he first went to work on this lot, several cars were "assigned" to him for sale, cars that he had not himself bought; that he did not agree at any time to bear any losses in the transactions involved.

In regard to their agreement, Hamilton testified: that Callahan came to him very dissatisfied with his connection with Evans Motors, saying that he knew some people that would supply him late model cars at a better figure than he could buy them ordinarily, and asked Hamilton to furnish him the money to buy and sell automobiles and that he agreed to do that, agreeing to furnish up to $15,000; that "As to how he was to get the money, who he was to get it from, well, he bought some cars and I paid for the cars for him. He kept his own records and I kept up with the amounts of money that he drew"; that Callahan was not working for him as an employee, but was for himself; that he bought automobiles as C. A. Callahan and he didn't tell him when to come or when to go and had no jurisdiction over his working hours; that he did not deduct or withhold Social Security tax from his commissions because he was not an employee; that Callahan paid rent and that for that he had the use of a very valuable location, had porters, facilities for operating a business office, space, and the use of a telephone;

that the porter service consisted of polishing the cars and getting them ready for sale; that they did not advertise the cars in the papers; that the $25 per car was rent with a minimum of $200 a month which took care of 8 cars, and if he sold more cars than that he paid more rent; that in addition to that his agreement was to split the earnings that he made with the $15,000; that he, Hamilton, had no jurisdiction over Callahan; that he was not present when the two cars in question were bought and sold; that he never authorized Callahan to execute bills of sale and just sign his individual name in behalf of Hamilton; that if Callahan bought an automobile for $1800 and was only able to sell it for $1600 he would look to Callahan for the full $1800; that if an automobile was purchased by Callahan and stolen from the lot it would have been Callahan's loss; that Callahan was in business for himself and he, Hamilton, had nothing whatever to do with how Callahan operated; that the two automobiles involved in this case were Callahan's automobiles and not his.

As will be seen from this resumé of Callahan's and Hamilton's testimony, while there was some agreement between them, there was also considerable conflict as to the details and ultimate effect of the arrangement. Rodgers testified that Hamilton carried insurance on all the automobiles on the lot and Austin, the plaintiff's agent who negotiated the purchase of the two automobiles in question, testified that he thought he was dealing with Hamilton and that he would not have purchased the two automobiles from Callahan unless he had checked into the titles, but he admitted that he knew nothing of the agreement between Callahan and Hamilton or how they were operating. Under instructions eliminating the question of a partnership between Callahan and Hamilton from their consideration, the jury returned a verdict for the defendant. The court overruled the plaintiff's motion for a new trial as amended and the sole exception here is to that ruling.

The plaintiff contends that the defendant was liable, if at all, under one of three theories: (1) that Callahan was an employee of Hamilton, (2) that he was an agent, and (3) that Callahan and Hamilton were partners and that Hamilton is liable as a principal in the transaction. The defendant con-

tended that the relation between Hamilton and Callahan was simply one of debtor and creditor on one hand and landlord and tenant on the other. The sole question argued by counsel for the plaintiff in error before this court, aside from the general grounds, is whether the evidence would have authorized the jury to find that Callahan and Hamilton were partners, and whether it was error for the court so to charge the jury as to remove from their consideration all questions of partnership and to refuse the request of counsel for the plaintiff to charge on the law of partnership.

"A partnership may be created either by written or parol contract, or it may arise from a joint ownership, use, and enjoyment of the profits of undivided property, real or personal." Code, § 75-101. "A joint interest in the partnership property, or joint interest in the profits and losses of the business, shall constitute a partnership as to third persons. A common interest in profits alone shall not." § 75-102; *Dawson National Bank* v. *Ward & Gurr*, 120 *Ga.* 861, 863 (48 S. E. 313); *Dawson* v. *Blitch*, 11 *Ga. App.* 840 (76 S. E. 596); *Clegg* v. *Lyons, Harris & Brooks*, 30 *Ga. App.* 482, 485 (118 S. E. 432). It seems that the definitions of a partnership advanced by the courts are as many and varied as the forms of partnership agreements men have seen fit to enter into. However, it is settled in Georgia that, where one of the parties to an agreement has only an interest in the net profits and no interest in or liability for (as among the contracting parties) the losses of the enterprise, he is not, even as to third parties, a partner. *Hall & Ham* v. *Stone*, 11 *Ga. App.* 269 (75 S. E. 140); *Sauls* v. *Scott*, 46 *Ga. App.* 243 (1) (167 S. E. 311).

It seems appropriate to note some further observations by our courts which are pertinent to the questions raised and the facts of this case. In *Buckner* v. *Lee*, 8 *Ga.* 285, 288, one of the earliest cases dealing with this phase of the law of partnership in this State, it was noted that not in all cases where a person receives a part of the profits of a business is he a responsible partner. "Thus a party may, by agreement, receive by way of rent, a portion of the profits of a farm or tavern, without becoming a partner. Prince *v.* Hankinson, 6 Halst. 181. 3 Kent, 34. So, to allow a clerk or agent a portion of the profits of

sales, as a compensation for labor, or a factor a percentage on the amount of sales, does not make the agent or factor a partner, where it is intended merely as a mode of payment, and when not understood as an interest in the profits, as profits." In *Dalton City Co. v. Dalton Mfg. Co.*, 33 *Ga.* 243, 254, the court, quoting from the *Buckner* case, supra, said: " 'It is clear, then, that if one is to receive a certain proportion of profits, as one-third, or one-half, as profits, he is a partner. If a certain sum is agreed to be paid out of profits, and the party does not look to that fund alone for payment, he is not a partner; but if the sum to be paid is not fixed, but may be increased or diminished by the amount or accidents of the business, then the receiver is a partner.' "

Let us examine the facts of this case, as brought out by the testimony, in the light of this authority. Under the testimony here, the parties, Callahan and Hamilton, did not have a written contract of partnership, and if a partnership is to be inferred, it must be because of their joint ownership, use and enjoyment of the profits of undivided property, real or personal or because of their joint interest in the profits *and* losses of the business that Callahan admittedly was to conduct. It is practically conceded that they did not have such a joint interest in or ownership of any property as to make them partners. Hamilton owned or had the right of possession to the lot whereon the used car business was conducted. This is shown by the fact that for his use of the lot as a place to do business, Callahan was bound to pay Hamilton $200 per month, minimum, whether or not he made any profits or made any sales at all. This was testified to by both parties, and nothing appears from the evidence that would justify a holding that it was not, as designated, rent. There was absolutely no evidence that the ownership of the automobiles in which Callahan dealt was jointly in Hamilton and Callahan. Each testified that the ownership was in the other. The jury was authorized to find that ownership was in one or the other, but not in both. This same conclusion would seem to apply to the business itself. Under Callahan's testimony he was nothing more than an employee, or at least that is what he seems to have sought to show. Hamilton testified that Callahan was an independent operator (contractor) and

that he had no interest in Callahan's business beyond securing his indebtedness to him.

The whole question in this case seems to hinge on the question of profits and losses, and how they were to be divided, or rather what was the real effect of the agreement as to them. Here again there was a conflict in the testimony, both Callahan and Hamilton attempting to show that all the responsibility for losses was on the other. Callahan's testimony clearly showed that he regarded himself as merely an employee, that the business and automobiles were Hamilton's who was alone liable for any losses. Hamilton, on the other hand, testified that the business was Callahan's as also were the automobiles in which he dealt, that when he purchased the automobiles the title to them vested in. him and he became Hamilton's debtor for the purchase-price, and that Callahan would have had to bear any losses from bad deals, market fluctuations, fire or theft and the like. Here again, there was absolutely no testimony that tended to show that there was any joint interest in the profits and losses as such. To be sure, Hamilton's income from the deal depended to some extent upon whether Callahan made any profits, but not entirely so, for as we have said Callahan was bound for the minimum amount of $200 each month as rent whether he did any business at all. Under the evidence it is apparent that the jury accepted Hamilton's theory of the relationship, that is that Callahan was merely his debtor and tenant. We cannot say that this entire arrangement is inconsistent with the theory that the parties stipulated for a minimum rent of $200 per month with an additional rental payment conditioned on Callahan doing more than a minimum volume of business, nor with the theory that Callahan would pay as interest for the use of the $15,000 credit advanced him by Hamilton a sum equal to one-half the net profits realized by him in his business. Under such a view of the case, the evidence was sufficient to authorize the jury to infer that Callahan was in business for himself as an independent operator. The fact that Hamilton's endorsement appeared on the back of the check with which the automobiles were paid for by the plaintiff is not evidence of a partnership between him and Callahan, and, in the absence of some other evidence as to how it came into his possession, is

not evidence of a partnership between Callahan and Hamilton. As to the work or assistance that Callahan was to give to the other men on the lot and to Hamilton's employee, Rodgers, it may be said that such work as to the other men on the lot was merely a mutual courtesy extended by all who were in similar circumstances to each other, and, as to Hamilton, was merely a part of the rent. Callahan in effect so testified. For these reasons the trial court did not err in excluding from the jury's consideration all questions of partnership and in overruling the two special grounds of the motion. *Sankey & Shorter* v. *Columbus Iron Works*, 44 *Ga.* 228; *Huggins* v. *Huggins*, 117 *Ga.* 151, 155, 156 (43 S. E. 759); *Dawson Nat'l Bank* v. *Ward & Gurr*, 120 *Ga.* 861 (48 S. E. 313); *Floyd* v. *Kicklighter*, 139 *Ga.* 133 (76 S. E. 1011); *Smith* v. *Hancock*, 163 *Ga.* 222 (136 S. E. 52); *Dawson* v. *Blitch*, supra; *Clegg* v. *Lyons, Harris & Brooks*, supra; 47 C. J., Partnership, 672, 673, §§ 65, 66.

2. As we have already said, Hamilton's testimony and that of Rodgers tended to establish the fact that Callahan was an independent operator, that the relation between him and the defendant was merely that of debtor and creditor and landlord and tenant, and that Hamilton had no interest other than this in Callahan's business. This evidence was ample to support the verdict of the jury for the defendant, and the trial court did not err in overruling the motion for new trial on the general grounds.

*Judgment affirmed. Sutton, C.J., concurs. Felton, J., concurs specially.*

FELTON, J., concurring specially. I concur in the judgment and in the opinion except that part in which it is ruled that no partnership was proved. I do not think that such a ruling is necessary. All that is necessary for this court to rule on that question is that in this case no recovery against a partner on a partnership obligation is permissible under the pleadings. The action is not one against a partnership nor one against an individual upon a partnership obligation.